# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

E.M.,                                       :
                                            :
     Plaintiff,                            :          Civil Action No.:      24-956 (RC)
                                            :
     v.                                    :          Re Document Nos.:    19, 24
                                            :
SHADY GROVE REPRODUCTIVE                    :
SCIENCE CENTER, P.C.,                       :
                                            :
     Defendant.                            :

## MEMORANDUM OPINION

### GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS; DENYING PLAINTIFF'S MOTION TO CONSOLIDATE CASES

## I.  INTRODUCTION

Plaintiff E.M.[1] files suit against Defendant Shady Grove Reproductive Science Center,
P.C. ("Shady Grove"), a fertility center that she alleges mishandled the release and transfer of her
frozen egg(s)[2] between March 2021 and January 2022.  E.M. claims that Shady Grove failed to
timely fulfill her written requests to release her egg(s) and that it violated their agreements by
transferring her egg(s) without her consent.  Plaintiff alleges that Shady Grove returned her
egg(s) only after multiple demands, communications, and delays.  E.M. asserts that these actions

---

[1] The Court is permitting E.M. to proceed under pseudonym because this lawsuit involves
highly sensitive medical information concerning both E.M. and J.S., the individual she hoped
would be the father of her child.  *See* Mem. Op. and Order, ECF No. 5.

[2] In the Amended Complaint, the majority of references to the number of egg(s) indicate
that Plaintiff initially requested the return of one of her eggs, or an oocyte.  *See generally* First
Am. Compl. ("FAC"), ECF No. 17.  However, there are also references suggesting that
Plaintiff's subsequent requests may have included multiple eggs.  *See, e.g.*, *id.* ¶ 38 ("On or
about May 22, 2021, E.M. again demanded the return of her frozen eggs.").  Notwithstanding
these discrepancies, the Court will categorize Plaintiff's allegations as they are presented in the
specific paragraph cited.

caused harm, particularly because by the time her eggs were transferred to her preferred provider, her doctors determined that she could no longer have biological children due to her age.  Defendant moves to dismiss the first amended complaint, arguing that it improperly raises allegations pending in a separate complaint, it is time-barred, and it fails to allege necessary elements of each of its purported claims.  Def.'s Mot. to Dismiss Pl.'s First Am. Compl., ECF No. 19; Statement of P. & A. in Support of Def.'s Mot. Dismiss Pl.'s First Am. Compl. ("MTD"), ECF No. 19-1.  Separately, Plaintiff moves to consolidate this case ("*E.M. II*") with *E.M. v. Shady Grove Reproductive Science Center, P.C.*, Civil Action No. 1:19-cv-657 ("*E.M. I*").  Pl.'s Mot. to Consolidate Cases ("Pl.'s Mot.), ECF No. 24.  For the following reasons, Defendant's motion to dismiss is granted in part and denied in part and Plaintiff's motion for consolidation is denied.

## II.  FACTUAL AND PROCEDURAL BACKGROUND[3]

### A.  *E.M. I*

In 2012, E.M. began attending Shady Grove at age 39 and enrolled in its egg freezing program, producing six cryopreserved eggs (five mature, one immature) after one retrieval cycle. *E.M. I*, Compl. ¶¶ 6, 9, 24, ECF No. 17.  Over the next few years, she and her partner for these endeavors, J.S., tried to conceive naturally and through other treatments, but they experienced miscarriages and unsuccessful cycles of intrauterine insemination ("IUI") and in vitro fertilization ("IVF").  *Id.* ¶¶ 34–45.  E.M. and J.S. were not married, did not live together, and had no legal or financial ties—instead, they were best friends who intended to co-parent any

---

[3] The Court generally recounts the facts as alleged in the first amended complaint in this litigation.  Where necessary, the Court includes additional background details from the complaint and other materials in E.M. I.  The Court does not rely on anything outside of the pleadings in evaluating Shady Grove's motion to dismiss.

child they conceived together.  *Id.* ¶ 35; *E.M. I*, Suppl. Decl. of E.M. ¶ 111, ECF No. 22.  In 2019, E.M. returned to Shady Grove to discuss using her frozen eggs—though she had concerns—including her financial options and consent forms, particularly regarding J.S.'s involvement in her care.  *E.M. I*, Compl. ¶¶ 54, 61, 67–68.  Defendant had previously categorized J.S. as part of E.M.'s household for financial purposes, which E.M. contested.  *Id.* ¶¶ 43, 63–64, 98, 102.

E.M. also objected to the "Consent to Thaw" form, which required J.S.'s approval for procedures involving solely her body, despite her desire to make those decisions independently. *Id.* ¶¶ 67–69, 74.  After several conversations with Shady Grove, Plaintiff learned that Shady Grove's policies required J.S.'s involvement if he was classified as her "sperm partner" rather than as a "sperm donor."  *Id.* ¶¶ 84, 85.  Shady Grove then presented E.M. with three options: (1) use J.S. as a known sperm donor, (2) treat J.S. as a partner with shared financial responsibility, or (3) terminate her relationship with Shady Grove.  *Id.* ¶¶ 108, 112, 113.  E.M. disagreed with these options and felt that they were retaliatory and discriminatory.  *Id.* ¶¶ 116, 131.  Shady Grove eventually decided to terminate its relationship with E.M., citing a breakdown in trust and her refusal to accept their policies.  *E.M. I*, Ex. A to Def.'s Statement of P. & A. in Opp'n to Pl.'s Mot. for Prelim. Inj. ¶¶ 41–43 ("Decl. of Gilbert Mottla"), ECF No. 14-1.  Shady Grove claimed that E.M.'s complaint about their procedures and policies were the cause of the termination, not discrimination or retaliation.  *Id.*  E.M. was notified of the termination in a phone call with Shady Grove's Barbara Osborn, her longtime doctor, and she later received formal letters confirming the decision.  *Id.* ¶¶ 43–44; *E.M. I*, Compl. ¶¶ 151–153, 156–57.

E.M. then filed her first lawsuit in March 2019, claiming discrimination and breach of contract under the District of Columbia Human Rights Act and other laws regarding Shady

Grove's alleged misconduct related to its termination of E.M. as a patient.  *See generally E.M. I*,
Compl.  *E.M. I* remains pending in this Court.  In March 2021, two years after initiating the suit,
Plaintiff "arranged for another local treatment facility, Genetics and IVF Institute ("GIVF"), to
receive her frozen egg(s) from [Shady Grove]."  FAC ¶ 5.  Four years after initiating the suit, on
September 19, 2023, Plaintiff filed a motion for leave to file an amended complaint.  *E.M. I*, Pl.'s
Mot. for Leave to File First Am. Compl., ECF No. 119.  With the proposed amendment, E.M.
aimed to add a claim for conversion and to broaden her existing claim for intentional infliction of
emotional distress, which is the basis of many of the allegations now presented in the first
amended complaint in *E.M. II*.  Ex. B. to Pl.'s Mot. for Leave to File First Am. Compl., ECF No.
119-3.  Prior to ruling on Plaintiff's motion for leave to amend, and following the Court's
observation at a status conference that the motion was likely not timely filed, E.M. filed the
instant lawsuit that commenced *E.M. II*.  On May 9, 2024, E.M. voluntarily withdrew her motion
for leave to amend in *E.M. I*.  *E.M. I*, Notice of Withdrawal of Mot., ECF No. 134.

### B. *E.M. II*

On April 3, 2024, Plaintiff filed the instant suit against Defendant alleging that "[o]n or
about March 17, 2021, E.M. demanded in writing that [Shady Grove] release one of her frozen
eggs to be transported to her new doctor," which she claims was untimely fulfilled.  Compl. ¶¶
10, 15, 24, 32, ECF No. 1.  Shady Grove filed a motion to dismiss on July 8, 2024, *see* Def.'s
Mot. Dismiss Pl.'s Compl., ECF No. 13, and Plaintiff then filed her first amended complaint on
July 28, 2024.  In that complaint, Plaintiff alleges that "on or about April 5, 2021, using an
appropriately modified version of [Shady Grove]'s purported [release] form, E.M. demanded that
[Shady Grove] return one of E.M.'s eggs to her" and that "[o]n or about May 22, 2021, [she]
again demanded the return of her frozen eggs."  FAC ¶¶ 13, 38.  Plaintiff alleges that the March

2021 request was not a formal request for the eggs; it was instead a "preliminary request" because her counsel indicated that he would be "back in contact with an actual request to transfer one of E.M.'s eggs." *Id.* ¶ 8; *see also* Ex. 2 to FAC, ECF No. 17-2.  After numerous discussions between the parties, which included two formal transfer requests on April 5, 2021 and May 22, 2021, E.M. signed an authorization with Shady Grove to transfer her eggs using one of Shady Grove's transport tanks June 1, 2021.  FAC ¶ 58.  However, on June 3, 2021, Plaintiff alleges that Shady Grove violated their agreement by contacting GIVF without E.M.'s consent and transporting three of her eggs in GIVF's tank, bypassing Shady Grove's quality control procedures. *Id.* ¶¶ 59–61.

On approximately October 26, 2021, Plaintiff requested that Shady Grove transfer the remaining eggs to GIVF.  *Id.* ¶ 63.  Following several written communications, on November 8, 2021, E.M.'s counsel informed Shady Grove that she had decided to delay the transfer because the document necessary for the transfer contained conditions that E.M. did not previously agree to when she initially froze and stored her eggs with Shady Grove.  Ex. 10 to FAC, ECF No. 17-10.  Two months later, on January 19, 2022, E.M. made another demand for her eggs, *see* FAC ¶ 68; Ex. 11 to FAC, ECF No. 17-11, specifically requesting to schedule the transfer for January 24, 25, or 26, 2022, *see* Ex. 11 to FAC.  Plaintiff alleges that Shady Grove once again tried to impose different conditions before returning the eggs, *see* FAC ¶ 69, which led to more correspondence between the parties, but Shady Grove ultimately transferred all of the remaining eggs on or around January 25, 2022.  *Id.* ¶¶ 70–71.  E.M. claims that because she is over 50 years old, she has been advised by her medical providers that she can no longer have biological children. *Id.* ¶ 72.

## III.  LEGAL STANDARDS

### A.  Motion to Consolidate Cases

The Court has broad discretion in deciding whether to consolidate actions before it that involve "common question[s] of law or fact."  Fed. R. Civ. P. 42(a); *Biochem Pharma, Inc. v. Emory Univ.*, 148 F. Supp. 2d 11, 13 (D.D.C. 2001).  "[C]onsolidation is a purely ministerial act which[] . . . relieves the parties and the Court of the burden of duplicative pleadings and Court orders."  *New York v. Microsoft Corp.*, 209 F. Supp. 2d 132, 148 (D.D.C. 2002).  "If the parties at issue, the procedural posture and the allegations in each case are different, however, consolidation is not appropriate."  *Hanson v. District of Columbia*, 257 F.R.D. 19, 21 (D.D.C. 2009) (citing *Stewart v. O'Neill,* 225 F. Supp. 2d 16, 21 (D.D.C. 2002)).

To determine whether actions should be consolidated, a court considers "(1) whether the relief sought varies substantially between the two actions; (2) whether defendants are being sued in different capacities; and (3) what would be gained by consolidation and what injury would be suffered by failure to consolidate."  *Clayton v. District of Columbia*, 36 F. Supp. 3d 91, 93 (D.D.C. 2014) (citation omitted).  "[C]ourts weigh considerations of convenience and economy against considerations of confusion and prejudice."  *Blasko v. Wash. Metro. Area Transit Auth.*, 243 F.R.D. 13, 15 (D.D.C. 2007) (internal quotation omitted); *see also Nat'l Ass'n of Mortg. Brokers v. Bd. of Governors of the Fed. Rsrv. Sys.*, 770 F. Supp. 2d 283, 286 (D.D.C. 2011) (stating that courts should weigh "the risk of prejudice and confusion wrought by consolidation against the risk of inconsistent rulings on common factual and legal questions").

### B.  Motion to Dismiss

The Federal Rules of Civil Procedure require plaintiffs to properly "state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  A motion to dismiss under Rule 12(b)(6)

does not test a plaintiff's ultimate likelihood of success on the merits. *See Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *abrogated on other grounds by Harlow v. Fitzgerald*, 457 U.S. 800, 807 (1982). Instead, a court considering a Rule 12(b)(6) motion presumes that the complaint's factual allegations are true and construes them in the light most favorable to the plaintiff. *See, e.g.*, *United States v. Philip Morris, Inc.*, 116 F. Supp. 2d 131, 135 (D.D.C. 2000). Nevertheless, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). To that end, a plaintiff's factual allegations "must be enough to raise a right to relief above the speculative level, . . . on the assumption that all allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555 (citations omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are insufficient to withstand a motion to dismiss. *Iqbal*, 556 U.S. at 678. A court need not accept a plaintiff's legal conclusions as true, *see id.*, nor must a court presume the veracity of legal conclusions that are "couched as factual allegations," *see Twombly*, 550 U.S. at 555 (citing *Papasan v. Allain,* 478 U.S. 265, 286 (1986)).

A defendant may also raise the affirmative defense of statute of limitations in a Rule 12(b)(6) motion when the facts that give rise to the defense are clear from the face of the complaint. *See Smith–Haynie v. District of Columbia,* 155 F.3d 575, 578 (D.C. Cir. 1998). Because statute of limitations issues often depend on contested questions of fact, however, courts should hesitate to dismiss a complaint on statute of limitations grounds based solely on the face of the complaint. *Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C. Cir. 1996) (per curiam). Therefore, courts should grant a motion to dismiss only if the complaint on its face is conclusively time-barred. *Id.*; *Doe v. Dep't of Justice*, 753 F.2d 1092, 1115 (D.C. Cir. 1985). If

"'no reasonable person could disagree on the date' on which the cause of action accrued," the Court may dismiss a claim on statute of limitations grounds. *Smith v. Brown & Williamson Tobacco Corp.*, 3 F. Supp. 2d 1473, 1475 (D.D.C. 1998) (quoting *Kuwait Airways Corp. v. Am. Sec. Bank, N.A.*, 890 F.2d 456, 463 n.11 (D.C. Cir. 1989)).

## IV.  ANALYSIS

### A.  Motion to Consolidate Cases

Plaintiff argues that *E.M. I* and *E.M. II* should be consolidated, despite the fact that they are at different procedural stages and there are substantive differences in the allegations in their claims, because "[t]here is no reason to believe that consolidation would lead to juror confusion, prejudice to anyone or any delay."  Pl.'s Mot. at 3.  She further argues that "[c]onsolidation would conserve the resources of the Court and the parties" because "[i]t would allow the parties to dispose of all of the disputes between them in one judicial proceeding."  *Id*.  Defendant argues that the actions should not be consolidated because the two cases are at different procedural stages, which would significantly delay and be prejudicial to *E.M. I*, and because Plaintiff is attempting to circumvent the claim-splitting rule[4] by filing a second case with substantially similar allegations.  Def.'s Opp'n to Pl.'s Mot. to Consolidate Cases (Def.'s Opp'n) at 4–6, ECF No. 25.  Additionally, Defendant asserts Plaintiff has not adequately demonstrated that the benefits of consolidation outweigh the risks, costs, and burden on the parties and the Court.  *Id*.

At this juncture, *E.M. I* is a lawsuit by E.M. against Shady Grove for discrimination, breach of contract, and wrongful termination as a patient after Shady Grove allegedly imposed discriminatory policies regarding her use of frozen eggs and her financial and consent

---

[4] Defendant's argument regarding the claim-splitting rule is addressed in more detail in Section IV(B), where the Court discusses whether Plaintiff's claims should be dismissed as time-barred.

relationships with her intended co-parent, J.S.  *See generally E.M. I*, Compl.  In *E.M. II*,

however, E.M.'s lawsuit against Shady Grove is regarding the alleged mishandling of the release

and transfer of her frozen eggs, including untimely delivery and violations of allegedly agreed-

upon procedures, causing her harm as she faces infertility due to her age.  *See generally E.M. II*,

Compl.  Although *E.M. I* and *E.M. II* involve a common factual background at a high level of

generality, the legal issues are different, and the facts that bear on those issues are also different.

Therefore, *E.M. I* and *E.M. II* do not involve "common question[s] of law or fact."  Fed. R. Civ.

P. 42(a).  Given the lack of common questions of law or fact, deciding these cases separately will

not risk inconsistent rulings.

      Defendant asserts that "[c]onsolidation inevitably would result in further substantial delay

of [*E.M. I*], to permit full discovery in [*E.M. II*], yet another round of dispositive motions, and

new pretrial submissions."  Def.'s Opp'n at 5–6.  The Court agrees.  *E.M. I*, which was initiated

over six years ago, is at the joint pretrial submission phase, while *E.M. II* still has preliminary

motions pending.  Because *E.M. I* is "well on the way to complete resolution" and *E.M. II* "is in

an earlier stage, . . . consolidation is likely to delay the final resolution of" *E.M. I*.  *Singh v.

Carter*, 185 F. Supp. 3d 11, 18 (D.D.C. 2016)); *see also Stewart*, 225 F. Supp. 2d at 21 (holding

that when cases are "in very different stages of litigation, . . .judicial efficiency would not be

served by their consolidation").

      In opposition to the motion to amend in *E.M. I*, the parties disagreed on the impact that

the witnesses from *E.M. II* would have on the trial attorneys.  *See generally E.M. I*, Def.'s

Statement of P. & A. in Opp'n to Pl.'s Mot. for Leave to File First Am. Compl., ECF No. 120.

Specifically, Shady Grove argued that the new claims would disqualify necessary witnesses,

including their counsel, from acting as trial attorneys, causing undue delay and prejudice.  *Id.* at

8–9.  E.M. contends that the new claims involve the same witnesses as the original complaint

and would not significantly disrupt the trial, despite the need for additional discovery and expert

testimony.  *See* Pl.'s Mot.  Given the changes in counsel for both sides, it is possible that this

may no longer present an issue at trial, but it will undoubtedly complicate discovery in *E.M. II*.

As such, Plaintiff's assertion that discovery in *E.M. II* can be completed quickly is unrealistic.

Accordingly, the Court will not exercise its discretion to order consolidation.  *Klayman v. Jud.*

*Watch, Inc.*, 255 F. Supp. 3d 161, 175 (D.D.C. 2017).

## B.  Motion to Dismiss

### 1.  Statute of Limitations

Among the issues raised in the motion to dismiss,[5] Defendant argues that all of Plaintiff's

claims are barred by the applicable statute of limitations because she failed to file this action

within three years.  MTD at 5–7; *see also* D.C. Code § 12–301(a)(2) (establishing a three-year

limitations period "for the recovery of personal property or damages for its unlawful detention"),

(a)(7) (establishing a three-year limitations period for actions arising from "a simple contract,

express or implied"), and (a)(8) (establishing a three-year limitations period if one is not

specially prescribed).  In her opposition, Plaintiff counters that her claims are not time-barred

because her March 17, 2021"demand for return of the property was preliminary, in that it was

not to take effect until an 'actual request' to transfer the eggs was made."  Pl.'s Opp'n to Mot. to

---

[5] Defendant also argues that *E.M. II* should be dismissed because it is duplicative with *E.M. I* and that this action raises allegations pending in the *E.M. I* complaint.  MTD at 4–5. Although Plaintiff moves to consolidate these cases, she herself asserts that the claims in *E.M. II* "are fundamentally different in kind, turn on a different core of operative facts, and relate to a different time period than E.M.'s older case against the same defendant before this Court" (*E.M. I*) and is therefore not duplicative of *E.M. I*.  *See* MTD Opp'n at 1.  For the same reasons that Plaintiff's motion to consolidate cases is denied, Defendant's argument that this action should be dismissed because the cases are duplicative is not adequately demonstrated.  Therefore, the Court will not grant Defendant's motion to dismiss on those grounds.

Dismiss First Am. Compl. ("MTD Opp'n") at 13, ECF No. 21.  She also states that her March 2021 demand could not be considered a formal request because it did not specify the time and location for Shady Grove's transfer of the egg.  *Id.* at 13–14.  In her amended complaint, Plaintiff alleges that she first demanded transfer of the frozen egg on April 5, 2021, and Shady Grove "unambiguously and unreasonably refused" the request on April 12, 2021.  FAC ¶¶ 11, 14.

"In ruling on a Rule 12(b)(6) motion grounded in a statute of limitations defense, a court must accept the well-pleaded allegations in the complaint as true and determine whether the plaintiff has plausibly alleged a claim that is not time-barred."  *Wash. Metro. Area Transit Auth. v. Ark Union Station, Inc.*, 268 F. Supp. 3d 196, 204 (D.D.C. 2017).  The first amended complaint draws a distinction between the March 17, 2021 request, which Plaintiff alleges was only a preliminary request that Shady Grove did not refuse, *see* FAC ¶¶ 8,10, and the April 5, 2021 request, which Shady Grove allegedly refused on April 12, 2021.  *Id.* ¶ 14.  Plaintiff's initial complaint in this case was filed on April 3, 2024.  Compl.  In the first amended complaint, Counts II (breach of contract), III (negligence/recklessness), IV (breach of fiduciary duty), V (intentional infliction of emotional distress), VI (negligent infliction of emotional distress) all arise out of events that allegedly took place on April 5, 2021.  *See generally* FAC.  Counts VIII (breach of contract), IX (negligence and recklessness), X (breach of fiduciary duty), XI (intentional inflction of emotional distress), and XII (negligent infliction of emotional distress) all arise out of events that allegedly took place on May 22, 2021.[6]  So for those counts "[i]t is not

---

[6] In the heading for Count XII, the first amended complaint states that Plaintiff alleges "Intentional Emotional Distress as to Demand on May 21, 2021."  FAC at 12.  But in the paragraphs describing that allegation, the first amended complaint says the following: "In refusing to honor E.M.'s demand for an oocyte on or around May 22, 2021, [Shady Grove] committed the tort of intentional infliction of emotional distress . . . ."  *Id.* ¶ 53.  The Court understands that Count XII also stems from events that took place on May 22, not May 21.

clear from the face of the complaint that the plaintiff's claim is time-barred." *See Williams-Jones v. LaHood*, 656 F. Supp. 2d 63, 68 (D.D.C. 2009).

Plaintiff also asserts two conversion claims against Shady Grove.  The statute of limitations analysis for those counts is more complicated.  Count I asserts that on April 5, 2021, Shady Grove unlawfully refused to release one of Plaintiff's frozen eggs and medical records, demanding an unreasonable liability waiver before returning her property.  FAC ¶¶ 11–23.  She claims that Shady Grove's refusal to accept her modified release form and return her property constituted conversion, depriving her of access and control over her own biological material.  *Id.*  The second conversion claim, Count VII, alleges that on May 22, 2021, E.M. again demanded the return of her frozen egg, but Shady Grove unreasonably refused, insisting on a release of liability that Plaintiff refused to sign.  *Id.* ¶¶ 37–39.  E.M. claims that this refusal, which caused her to miss a critical opportunity to use the eggs for treatment, constituted conversion, as it wrongfully denied her access to her property.  *Id.* ¶¶ 40–42.  Defendant argues that Plaintiff's conversion claim fails because Shady Grove "released and returned E.M.'s eggs on June 3, 2021" and "[w]ith such return of E.M.'s eggs pursuant to her demands, E.M. has failed to allege any fact at all that plausibly may compromise the complete or very substantial deprivation of any possessory rights E.M. had in her eggs."  MTD at 8.

An essential element of a conversion claim is whether the defendant's dominion and control constituted "the *complete* or *very substantial* deprivation of possessory rights in the property."  *Pearson v. Dodd*, 410 F.2d 701, 706 (D.C. Cir. 1969) (emphasis added).  A conversion claim accrues "when the plaintiff demands the return of the property and the defendant refuses, or when the defendant takes some action that a reasonable person would understand to be . . . conversion[.]"  *Malewicz v. City of Amsterdam*, 517 F. Supp. 2d 322, 335

(D.D.C. 2007) (citing *In re McCagg*, 450 A.2d 414, 416 (D.C. 1982)).  The statute of limitations

for conversion claims requires a defendant's refusal to return the property to be "absolute and

unconditional." *Id.* (internal quotation marks omitted).  Given this, Plaintiff's claims are barred

if Defendant "absolute[ly] and unconditional[ly]" refused to return the property prior to April 3,

2021—three years before she filed her initial complaint.

       The parties disagree on when the conversion claim accrued.  Shady Grove argues that the

conversion claim arose on March 17, 2021, the date of E.M.'s first demand for the return of the

egg, and that is the point when the conversion accrued.  *See* MTD at 5–6; *see also* D.C. Code

§ 12–301(a)(2).  Plaintiff counters that the conversion claim did not accrue on March 17, 2021,

when she sent Shady Grove merely a preliminary demand and not a formal request for the return

of the property.  Pls.' Opp'n to MTD at 13–15.  She argues that her formal request for the return

of the eggs was on April 5, 2021, and the conversion claim accrued when Shady Grove refused

on April 12, 2021.  *Id.*  Plaintiff maintains that this refusal constitutes the actionable event that

triggered the conversion claim.  *Id.*  The parties' differing positions—particularly Shady Grove's

assertion that there was no complete or substantial deprivation of rights due to the ongoing back-

and-forth between the parties before the egg was released—create a factual dispute regarding

when the tort accrued.  The Court has made clear that "because statute of limitations issues often

depend on contested questions of fact, dismissal is appropriate only if the complaint on its face is

conclusively time-barred." *Firestone*, 76 F.3d at 1209.

       On April 5, 2021, after her formal request of the release of the egg, Plaintiff filled out

Shady Grove's Request for Release of Oocytes Form that included several deviations from the

original release form.  *See* Ex. 6 to FAC, ECF No. 17-6.  Namely, E.M. requested that the egg

not be shipped because a courier will pick it up, and she does "not release [Shady Grove] or any

of its affiliates of any liability" and does "not waive any claims against [Shady Grove] or its affiliates on authorizing th[e] transfer."  *Id*.  On April 12, 2021, Defendant's counsel stated that Shady Grove could not accept the transfer authorization form as marked up by E.M. due to several reasons, including the need for a clear transfer to another embryology lab and liability concerns.  *See* Ex. 7 to FAC,  ECF No. 17-7.  Shady Grove also claims it could not agree to remove certain provisions, including those regarding "risks associated with acts of God" and the guarantee of specimens once they leave Shady Grove's custody.  *Id*.  On May 22, 2021, Plaintiff's counsel reached out to Defendant's counsel to let them know that Plaintiff's new clinic needed an egg in the next 48 hours and that the conditions included on the standard release form were "not acceptable and not defensible."  *See* Ex. 8 to FAC, ECF No. 17-8.  Defense counsel clarified in response that the conditions on the release form were standard, the language is not a release of any of E.M.'s claims, and "is in reference to the acknowledgement that [Shady Grove] cannot be held responsible once the oocytes leave [Shady Grove]," and that Shady Grove "will quickly get [the egg] to the right people" if Plaintiff were to sign the documents.  *Id*.

For statute of limitations purposes, the critical point is that the amended complaint alleges that Defendant's refusal of Plaintiff's demand for the egg did not occur until April 12, 2021. FAC ¶ 14; *see also* Ex. 7 to FAC.  She contends that "th[e] request was unambiguously and unreasonably refused by [Shady Grove]" when it stated that it would not use the marked-up authorization form for the release.  *Id*.  At summary judgment, Shady Grove may well be able to show that E.M.'s claims accrued when she sent out her "preliminary request" on March 17, 2021.  But at the motion to dismiss stage, the Court looks only at the amended complaint, in which there is nothing that conflicts with Plaintiff's allegation that her conversion claims accrued on April 12, 2021.  *de Csepel v. Republic of Hungary*, 714 F.3d 591, 604 (D.C.

Cir. 2013). "Because [Plaintiff] filed [her initial] complaint within three years of that date, we reject [Defendant]'s statute of limitations argument." *Id.* Therefore, the Court denies Defendant's motion to dismiss Plaintiff's claims on statute of limitations grounds.

### 2. Failure to State a Claim

As a reminder, in addition to the conversion claims, Plaintiff alleges two counts of each of the following claims: breach of contract; negligence/recklessness; breach of fiduciary duty; intentional infliction of emotional distress; and negligent infliction of emotional distress. *See generally* FAC. The first of each of the counts refers to harm allegedly stemming from Plaintiff's April 5, 2021 request for her egg, while the second of each of the counts refers to harm allegedly stemming from her May 22, 2021 request. *Id.* ¶¶ 24–36, 43–57. Taking the remaining allegations in turn, the Court will now consider whether Plaintiff alleged the elements necessary for each of the claims.

#### a. *Breach of Contract (Counts II and VIII)*

In Count II, E.M. alleges that a contract existed between her and Shady Grove for the storage of her eggs, which included an agreement that the eggs would be returned to her upon reasonable demand. FAC ¶ 25. When Shady Grove allegedly refused her demand on April 12, 2021, E.M. claims Shady Grove materially breached the contract, causing her harm. *Id.* ¶ 26. In Count VIII, Plaintiff also alleges Shady Grove breached its contract with her by refusing her second demand for the return of her egg on May 22, 2021, asserting that Shady Grove's refusal caused harm. *Id.* ¶ 43. Defendant argues that the Egg Storage Consent Form that Plaintiff signed ("Consent Form"), *see* Ex. 1 to MTD, ECF No. 19-2, which acknowledges her responsibility for the transport and disposition of her eggs to another facility, undermines her claim of making a "reasonable demand" for the return of her eggs and that its language defeats

E.M.'s claims for breach of contract. MTD at 9–10. Shady Grove also asserts that E.M.'s refusal to abide by the terms of the Consent Form, including her demands for liability release, invalidates her breach of contract allegations. *Id.*

To prevail on a claim of breach of contract, a plaintiff must establish "(1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by breach." *Tsintolas Realty Co. v. Mendez*, 984 A.2d 181, 187 (D.C. 2009) (citation omitted). "A valid and enforceable contract requires the: 1) express intention of the parties to be bound; 2) agreement to all material terms, and 3) the assumption of mutual obligations." *Millennium Square Residential Ass'n v. 2200 M St. LLC*, 952 F. Supp. 2d 234, 247 (D.D.C. 2013).

Plaintiff argues that the Consent Form should not be considered in the context of Defendant's motion to dismiss because "[Shady Grove] has no right to proffer an exhibit outside the scope of the First Amended Complaint." MTD Opp'n at 17. The Court disagrees. E.M.'s allegations rely upon the terms of the Consent Form, as Plaintiff alleges that "[a] contract . . . existed between the parties relating to the oocytes stored by [Shady Grove], which came into being when [Shady Grove] agreed to store the biological material." FAC ¶ 25. "In evaluating a Rule 12(b)(6) motion to dismiss, a court may consider 'the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint,' or 'documents upon which the plaintiff's complaint necessarily relies even if the [parties do not produce the] document[.]'" *Busby v. Capital One, N.A.*, 932 F. Supp. 2d 114, 133–34 (D.D.C. 2013) (quoting *Ward v. D.C. Dep't of Youth Rehab. Servs.*, 768 F. Supp. 2d 117, 119 (D.D.C. 2011)). Here, even though Plaintiff clarifies that the terms of the contract related to her claims are not solely limited to the Consent Form, she does not deny that her breach of contract claims

are partly based on the form.  MTD Opp'n at 17.  Therefore, the Court considers the Consent

Form when evaluating Plaintiff's claims.

On the Consent Form, Plaintiff signed, and therefore acknowledged, the following term:

> If I opt to transfer cryopreserved eggs to another fertility center or long-term storage
> facility, I understand that I have full and sole responsibility for the transport and
> disposition of the cryopreserved eggs and hereby release [Shady Grove] from any
> and all responsibility relating to the transport of the cryopreserved eggs.

Ex. 1 to MTD at 10.  Although the liability term on the Consent Form explicitly acknowledges

Plaintiff's full responsibility for the transport of the eggs, the liability language on the Request

for Release Form, which Plaintiff refused to sign, is broader in scope:

> I acknowledge that the transportation of cryopreserved specimens entails certain
> risks associated with acts of God (e.g., earthquake, flood, fire) that are outside the
> control of me or [Shady Grove] and that, in rare circumstances, the
> cryopreservation shipping tank may be lost, damaged or destroyed during transport.
> . . . *Once the oocytes leave [Shady Grove], [Shady Grove] makes no guarantee
> whatsoever as to the security, to the method of unpacking and storage, to safe
> thawing, to the clinical use, and ultimately, to the establishment of pregnancy*.

Ex. 6 to FAC at 1 (emphasis added).  Instead of signing the Request for Release Form, Plaintiff

included declarations on the form that assert the opposite of its printed terms, such as "I do not

release [Shady Grove] from any liability and I do not waive any claims against [Shady Grove] in

authorizing this transfer."  *Id*.

A claim is facially plausible, as required to survive a motion to dismiss for failure to state

a claim, when the plaintiff pleads factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged.  Fed. R. Civ. P. 12(b)(6).  "[T]o

state a claim for breach of contract so as to survive a Rule 12(b)(6) motion to dismiss, it is

enough for the plaintiff to describe the terms of the alleged contract and the nature of the

defendant's breach."  *Francis v. Rehman,* 110 A.3d 615, 620 (D.C. 2015) (citing *Nattah v.

Bush,* 605 F.3d 1052, 1058 (D.C. Cir. 2010)).  Plaintiff has described the terms of the contract

for the storage of her eggs, her demand for one of the eggs, and Defendant's alleged breach when it refused to release the egg. FAC ¶¶ 25, 26, 43–45. "When those elements are pled, as here, courts have held that plaintiffs have adequately stated a claim, despite the otherwise imprecise or vague nature of the complaint." *Burnett v. Am. Fed'n of Gov't Employees*, 102 F. Supp. 3d 183, 193 (D.D.C. 2015); *see also Nattah*, 605 F.3d at 1057–1058 (holding that plaintiff sufficiently pled a breach of contract claim where he described the terms of the alleged contract and defendants' breach, despite a lack of clarity in the complaint about when the contract had been formed and who had entered into it).

Determining whether E.M.'s demand for her egg was reasonable as a matter of law is challenging at this stage of the proceedings. The factual disputes surrounding the terms of the contract, the parties' respective obligations, and the reasonableness of E.M.'s demands require further examination through discovery and potential fact-finding at a subsequent stage of the action. Because Plaintiff has sufficiently stated a claim for breach of contract at this stage and further factual development is necessary before reaching any conclusions on the matter, it would be premature to make a definitive determination regarding the reasonableness of E.M.'s demands or the validity of her breach of contract claims. Therefore, the Court denies Defendant's motion to dismiss as to Plaintiff's breach of contract claims.

b. *Negligence or Recklessness (Counts III and IX)*

Count III asserts that Shady Grove, as Plaintiff's former healthcare provider and custodian of her eggs, had a duty to promptly return her frozen egg upon request but negligently and recklessly failed to do so, instead imposing unreasonable conditions to protect its own interests. FAC ¶ 28. Plaintiff claims that Shady Grove's actions, which delayed her ability to proceed with a time-sensitive medical procedure, caused her harm and were driven by a

disregard for the consequences to her, including risking her ability to become a mother. *Id*. ¶ 29. In Count IX, E.M. alleges that Shady Grove's refusal to return her egg on May 22, 2021 was again negligent and reckless. *Id*. ¶ 47–48. Defendant argues that E.M.'s negligence claims should be dismissed because they fail to establish the required duty of care, as the allegations are based solely on the contractual relationship between the parties. MTD at 10–11. Shady Grove further argues that, under District of Columbia law, a negligence claim must arise independently of the contract, but E.M. explicitly pleads that Shady Grove's duty stems from the contract, which is insufficient to support a negligence claim. *Id*.

To establish a claim for negligence, a plaintiff must allege that (1) the defendant owed the plaintiff a duty of care; (2) the defendant breached that duty; and (3) the defendant's acts proximately caused the plaintiff to suffer an injury. *See Wash. Metro. Area Transit Auth. v. Ferguson*, 977 A.2d 375, 377 (D.C. 2008); *see also Tarpeh–Doe v. United States*, 28 F.3d 120, 123 (D.C. Cir. 1994). The existence of a legal duty owed by the defendant to the plaintiff is an essential element of a negligence claim. *Wash. Metro. Area Transit Auth.*, 977 A.2d at 377. The tort "must exist in its own right independent of [a] contract, and any duty upon which the tort is based must flow from considerations other than the contractual relationship. The tort must stand as a tort even if the contractual relationship did not exist.'" *Carter v. Bank of America, N.A.*, 888 F. Supp. 2d 1, 15 (D.D.C. 2012) (quoting *Nugent v. Unum Life Ins. Co. of Am.*, 752 F. Supp. 2d 46, 53–54 (D.D.C. 2010)). Instead, the plaintiff "must specify a negligent act and 'characterize the duty whose breach might have resulted in negligence liability.'" *District of Columbia v. White*, 442 A.2d 159, 162 (D.C. 1982) (quoting *Kelton v. District of Columbia*, 413 A.2d 919, 922 (D.C. 1980)). The description of the duty cannot "rest on mere 'conclusory assertions.'"

*Simms v. District of Columbia*, 699 F. Supp. 2d 217, 227 (D.D.C. 2010) (quoting *White*, 442 A.2d at 162).

E.M. first alleges that "[Shady Grove]'s *agreement* to store [her] personal biological material, so that this material could be used to create a pregnancy, created a special duty of care and loyalty owed by [Shady Grove] to E.M., *as well as a contract*. FAC ¶ 6 (emphasis added). This alone is not enough to establish a noncontractual legal duty owed by [Shady Grove] to E.M.; a tort duty must exist independently of a contract. *Henok v. Chase Home Fin., LLC*, 915 F. Supp. 2d 162, 171 (D.D.C. 2013) (dismissing negligence claim because no duty was alleged separate from the contractual relationship); *see also Attias v. CareFirst, Inc.*, 365 F. Supp. 3d 1, 17–18 (D.D.C. 2019) (dismissing a negligence claim because the plaintiffs failed to plausibly allege that the defendant owed them an independent duty of care to protect private information beyond the scope of the contractual relationship). In her opposition to Defendant's motion to dismiss, Plaintiff clarifies that Shady Grove's duty arises from its "decision to accept custody of the personal biological material in question and to store it in the particular manner required for such material," which is separate from the contract. MTD Opp'n at 17–18 (emphasis omitted). But Plaintiff's allegations do not articulate how either of those duties were breached. Even assuming that Plaintiff adequately alleged Defendant owes a duty of care, she failed to demonstrate Defendant's breach of that duty. Here, Plaintiff has not adequately identified Defendant's alleged actions that constitute a breach of its alleged duty of care, as she only alleges that Shady Grove "fail[ed] to perform the task of making her frozen eggs available to E.M.[] on demand." FAC ¶ 29.

Plaintiff does not allege that Shady Grove was negligent in its handling of the frozen egg(s), such as in the storage process. Instead, she claims that Shady Grove failed to return her

eggs as required under their agreement. *Id.* ¶ 28. As the Court has articulated, the tort must

remain valid even if the contract did not exist. *Carter*, 888 F. Supp. 2d at 15. Plaintiff does not

"allege any facts to establish any duty independent of the contractual relationship" between her

and Shady Grove regarding the storage of her eggs, "or facts separable from the terms of those

documents upon which the tort[] may independently rest." *Henok*, 915 F. Supp. 2d at 171. As a

result, Plaintiff has not sufficiently articulated how Shady Grove's actions constituted a breach of

its duty of care, and the Court finds that Plaintiff has failed to state a claim for negligence or

recklessness.

### c. *Breach of Fiduciary Duty (Counts IV and X)*

Count IV asserts that Shady Grove, as Plaintiff's healthcare provider and custodian of her

eggs, owed her a fiduciary duty to promptly and reasonably return her egg(s) upon request. She

claims that Shady Grove breached this duty by refusing to honor her demand for the transfer of

her egg on April 5, 2021, causing her harm. FAC ¶ 31. In Count X, E.M. alleges that Shady

Grove also breached its fiduciary duty by refusing her demand for the return of her egg on May

22, 2021. *Id.* ¶ 50. Defendant argues that E.M.'s breach of fiduciary duty claims fail because

they do not adequately allege the existence of a fiduciary relationship, which is a necessary

element for such claims. MTD at 11–12. Shady Grove asserts that, under District of Columbia

law, no fiduciary duty exists between a former healthcare provider and patient, nor does a

contractual relationship automatically create a fiduciary duty beyond the agreement's terms,

making E.M.'s allegations insufficient to support her claims. *Id.*

To state a claim for breach of fiduciary duty under D.C. law, a plaintiff must allege that

"'(1) defendant owed plaintiff a fiduciary duty; (2) defendant breached that duty; and (3) to the

extent plaintiff seeks compensatory damages—the breach proximately caused an injury.'" *Bode*

& *Grenier, LLP v. Knight*, 821 F. Supp. 2d 57, 64 (D.D.C. 2011) (quoting *Paul v. Judicial Watch, Inc.*, 543 F. Supp. 2d 1, 5–6 (D.D.C. 2008)).  "As a general rule, the mere existence of a contract does not create a fiduciary duty."  *Paul*, 543 F. Supp. 2d at 6 (citing *Steele v. Isikoff*, 130 F. Supp. 2d 23, 36 (D.D.C. 2000)).  However, a fiduciary relationship may exist "where circumstances show that the parties extended their relationship beyond the limits of the contractual obligations to a relationship founded upon trust and confidence."  *Id*. (citing *Steele*, 130 F. Supp. 2d at 36).

The Court is not persuaded that Plaintiff has alleged the basis for finding a fiduciary relationship.  The amended complaint describes an ongoing relationship between Plaintiff and Shady Grove that lasted from October 2012 to January 2022, during which time Plaintiff was either a patient at Shady Grove or Shady Grove's facility stored at least one of Plaintiff's eggs. FAC ¶¶ 6, 71.  This relationship began as a typical doctor-patient relationship, but as the storage of Plaintiff's eggs continued while she was no longer a patient, it expanded into a more specialized, contractual relationship.  However, the FAC fails to allege facts that would establish a relationship of trust and confidence extending beyond their standard agreement.  The mere fact of ongoing treatment or storage does not demonstrate the type of special relationship necessary for a fiduciary duty to arise.  "As an initial matter, [Plaintiff] does not plead any facts which show the existence of a special relationship of trust or confidence with [Shady Grove] extending beyond [their] standard [contractual] relationship."  *Henok*, 915 F. Supp. 2d at 169.

"'A fiduciary relationship is founded upon trust or confidence reposed by one person in the integrity and fidelity of another.'"  *Bolton v. Crowley, Hoge & Fein, P.C.*, 110 A.3d 575, 584 (D.C. 2015) (quoting *Gov't of Rwanda v. Rwanda Working Grp.*, 227 F. Supp. 2d 45, 64 (D.D.C. 2002), *aff'd in part, remanded in part sub nom. Gov't of Rwanda v. Johnson*, 409 F.3d 368 (D.C.

Cir. 2005)).  Whether a fiduciary relationship exists is "a fact-intensive question, involving a searching inquiry into the nature of the relationship, the promises made, the type of services or advice given and the legitimate expectations of the parties." *Firestone*, 76 F.3d at 1211 (quoting *Church of Scientology Int'l v. Eli Lilly & Co.*, 848 F. Supp. 1018, 1028 (D.D.C. 1994)).  District of Columbia courts "have traditionally looked for . . . a special confidential relationship that transcends an ordinary business transaction and requires each party to act with the interests of the other in mind." *Ying Qing Lu v. Lezell*, 919 F. Supp. 2d 1, 6 (D.D.C. 2013) (internal quotation omitted).  Plaintiff argues that a fiduciary duty arose from her ongoing relationship with Shady Grove; however, her allegations fail to demonstrate a relationship grounded in trust and confidence beyond a typical contractual arrangement, in particular when, at the time of the alleged breach of such duty, the parties were in active litigation against one another.  The amended complaint lacks sufficient allegations to establish the special or confidential relationship required for a fiduciary duty under District of Columbia law.  As a result, the Court will grant Defendant's motion to dismiss as to Plaintiff's claims for breach of fiduciary duty.

### d. Intentional Infliction of Emotional Distress (Counts V and XI)

Count V asserts that Shady Grove intentionally inflicted emotional distress by denying Plaintiff access to one of her frozen eggs on April 5, 2021, which was critical for her last chance at becoming pregnant, by requiring her to sign allegedly unreasonable documents.  FAC ¶ 34. She claims that Shady Grove's actions, given their special relationship as her healthcare provider and custodian of her personal tissue, were extreme and caused foreseeable emotional harm.  *Id.* E.M. also claims that Shady Grove intentionally inflicted emotional distress by refusing her demand for an oocyte on May 22, 2021.  *Id.* ¶ 53.  Defendant argues that E.M.'s claims for intentional infliction of emotional distress are insufficient because she fails to provide any

factual basis linking Shady Grove's conduct to her alleged emotional distress, and Shady Grove's actions do not rise to the level of extreme and outrageous conduct required for such a claim because the brief delay in the release of her eggs does not rise to the level of conduct that would be considered "intolerable" or "atrocious."  MTD at 12–15; *see also Williams v. District of Columbia*, 9 A.3d 484, 494 (D.C. 2010).

Intentional infliction of emotional distress is a particularly narrow cause of action that applies only when a plaintiff shows "(1) extreme and outrageous conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress." *District of Columbia v. Tulin*, 994 A.2d 788, 800 (D.C. 2010) (cleaned up).  "Intent or recklessness can be inferred from the outrageousness of the acts." *Howard Univ. v. Best*, 484 A.2d 958, 985 (D.C. 1984) (citations omitted).  In deciding whether alleged conduct is "extreme and outrageous," the court will consider: "(1) applicable contemporary community standards of offensiveness and decency, and (2) the specific context in which the conduct took place[.]" *King v. Kidd*, 640 A.2d 656, 668 (D.C. 1993) (citation omitted).  The "liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities," although statements that were considered a "petty oppression," "trivial" or merely "inconsiderate and unkind" fifty years ago may be "extreme and outrageous" conduct under "today's social standards and principles (or vice-versa)." *Id.* (cleaned up).  D.C. courts apply a balancing test to determine whether the alleged conduct "violates prevailing social norms and is sufficiently outrageous to ensure that the advantage to society of preventing such harm seems greater than the advantage of leaving ill-disposed persons free to seek their happiness in inflicting it." *Id.* at 668–669 (cleaned up).

Plaintiff does not adequately articulate which of Defendant's conduct was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Williams*, 9 A.3d at 494. This "is a very demanding standard, infrequently met." *Cooke-Seals v. District of Columbia*, 973 F. Supp. 184, 188 (D.D.C. 1997). The allegations regarding Defendant's conduct include a delay of a few months between E.M.'s request for her eggs and the Defendant's eventual transfer of them. This delay was caused by the back and forth between the parties' attorneys as they argued over, and attempted to negotiate, the appropriate release forms for the request transfer. Such circumstances do not rise to the necessary level of outrageousness to be actionable as intentional infliction of emotional distress. *Kerrigan v. Britches of Georgetowne, Inc.*, 705 A.2d 624, 628 (D.C. 1997). Although Plaintiff's allegations are substantial, they do not satisfy that very demanding standard, as courts have been careful to restrict the reach of the doctrine. *See Harvey v. Strayer Coll.*, 911 F. Supp. 24, 27 (D.D.C. 1996) ("[T]he law does not, and doubtlessly should not, impose a general duty of care to avoid causing mental distress.") (internal quotation omitted). Thus, these allegations are insufficient to establish that Defendant's conduct was intentional, extreme, and outrageous in a manner that would support this claim. As such, Plaintiff failed to adequately state a claim for intentional infliction of emotional distress.

*e. Negligent Infliction of Emotional Distress (Counts VI and XII)*

Plaintiff alternatively raises claims for negligent infliction of emotional distress, where she similarly alleges in Count VI that Shady Grove's denial of access to one of her frozen eggs caused her severe emotional distress, claiming the conduct was extreme and outrageous because it frustrated her efforts to attempt to become pregnant—"the last opportunity she would have to do so in her lifetime." FAC ¶ 36. She asserts that Shady Grove's special relationship with her as

a former healthcare provider and custodian of her tissue created a high risk of emotional harm, which ultimately occurred. *Id*. In Count XII, Plaintiff claims that Shady Grove's refusal to honor her demand for an oocyte on May 22, 2021 also constitutes negligent infliction of emotional distress. *Id*. ¶ 56. Defendant again argues that E.M. fails to allege the necessary facts to support a claim for negligent infliction of emotional distress, as she does not demonstrate that Shady Grove had a special relationship with her that would implicate her emotional well-being. MTD at 12–14. Additionally, Shady Grove argues that its actions were limited to the storage of E.M.'s eggs, and after E.M.'s dismissal as a patient in 2019, the nature of their relationship did not involve care for her emotional well-being, making her claims insufficient as a matter of law. *Id*.

Under District of Columbia law, a plaintiff may make out a claim for negligent infliction of emotional distress in one of two ways. First, "a plaintiff must show that '(1) the plaintiff was in the zone of physical danger, which was (2) created by the defendant's negligence, (3) the plaintiff feared for his own safety, and (4) the emotional distress so caused was serious and verifiable.'" *Harris v. United States Dep't of Veterans Affs.*, 776 F.3d 907, 915 (D.C. Cir. 2015) (quoting *Rice v. District of Columbia*, 774 F. Supp. 2d 25, 33 (D.D.C. 2011)). In the alternative, a plaintiff must demonstrate that "the defendant has a relationship with the plaintiff, or has undertaken an obligation to the plaintiff, of a nature that necessarily implicates the plaintiff's emotional well-being," "there is an especially likely risk that the defendant's negligence would cause serious emotional distress to the plaintiff," and such harm ensues. *Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 810–811 (D.C. 2011). "The likelihood that the plaintiff would suffer serious emotional distress is measured against an objective standard: what a 'reasonable person' in the defendant's position would have foreseen under the circumstances in light of the

nature of the relationship or undertaking." *Id*. In addition, the plaintiff must establish that she actually suffered "serious and verifiable" mental distress. *Jones v. Howard Univ., Inc.*, 589 A.2d 419, 424 (D.C. 1991).

Although negligent infliction of emotional distress has additional elements specific to the nature of emotional harm and the foreseeability of distress, both negligence and negligent infliction of emotional distress claims require a showing that the defendant owed a duty to the plaintiff, a breach of that duty, and that the breach proximately caused the plaintiff's injury. *See Wash. Metro. Area Transit Auth*, 977 A.2d 375 at 377; *Tarpeh–Doe*, 28 F.3d at 123; *Harris*, 776 F.3d at 915; *Hedgepeth*, 22 A.3d 789 at 810–11; *White*, 442 A.2d at 162. As such, a claim for negligent infliction of emotional distress requires an underlying negligence claim because negligent infliction of emotional distress is predicated on the defendant's breach of a duty owed to the plaintiff. *Hedgepeth*, 22 A.3d 789 at 810–11. As discussed, there is no foundational duty or breach to support the negligent infliction of emotional distress claim, leading to its dismissal by default. *Wash. Metro. Area Transit Auth.*, 977 A.2d at 377.

Additionally, Plaintiff has not alleged how Shady Grove "undert[ook] an obligation to [her] of a nature that necessarily implicates [her] emotional well-being[.]" *Bradley v. Nat'l Collegiate Athletic Ass'n*, 249 F. Supp. 3d 149, 185 (D.D.C. 2017). E.M. refers to her deep desire to be pregnant in connection with her emotional well-being and how Defendant negligently impacted her ability to fulfill that desire, but she does not allege how her distress was "serious and verifiable." *Hawkins v. Washington Metro. Area Transit Auth.*, 311 F. Supp. 3d 94, 107 (D.D.C. 2018); *see also Sibley v. St. Albans Sch.*, 134 A.3d 789, 797–98 (D.C. 2016) (allegations of emotional trauma, disappointment, and hurt deemed insufficient to support a negligent infliction of emotional distress claim). "[E]motional distress must be acute, enduring

27

or life-altering." *Hedgepeth*, 22 A.3d at 817.  Because Plaintiff has not pleaded facts sufficient to plausibly state a claim of negligent infliction of emotional distress against Shady Grove, the Court grants Defendant's motion to dismiss those claims.

### *f.  Leave to File a Second Amended Complaint*

Lastly, in her opposition to Defendant's motion to dismiss, Plaintiff requests the Court to grant leave to file a second amended complaint should it find that the first amended complaint does not sufficiently allege facts to survive Shady Grove's motion to dismiss.  MTD Opp'n at 22. Defendant argues that Plaintiff "already exercised her ability to amend her complaint once" and "should not be given another chance to try and get her claims right."  Def.'s Reply in Support of Mot. Dismiss ("MTD Reply") at 11, ECF No. 23.

Under Federal Rule of Civil Procedure 15(a)(2), "a party may amend its pleading" for a second or subsequent time "only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2).  "The court should freely give leave when justice so requires."  *Id.*  "It is appropriate for a Court to grant leave to amend unless there is 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure [deficiencies] by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment.'"  *Utterback v. Geithner*, 754 F. Supp .2d 52, 56 (D.D.C. 2010) (second alteration in original) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).  As long as a district court provides a "sufficient reason" for the denial of a motion for leave to amend, it has not abused its discretion.  *Caribbean Broad. Syst., Inc. v. Cable & Wireless P.L.C.*, 148 F.3d 1080, 1083 (D.C. Cir. 1998) (quoting *Firestone*, 76 F.3d at 1208).

Plaintiff's only support for her request for leave to amend is that she has acted diligently, in good faith, and without undue delay and that the amendment would not cause Shady Grove to

28

suffer any prejudice.  MTD Opp'n at 23.  Plaintiff moved to amend the complaint and did not attach a proposed second amended complaint to any of her filings.  Local Civil Rules 7(i) and 15.1 require a motion for leave to amend a pleading to be "accompanied by an original of the proposed pleading as amended."  LCvR 7(i), 15.1.  That provides an independent reason to deny the motion to amend.  *See, e.g.*, *Friends of Animals v. Pruitt*, 258 F. Supp. 3d 91, 93 (D.D.C. 2017) ("The Court of Appeals has repeatedly 'faulted litigants for [the] shortcoming' of failing to attach a copy of their proposed amended complaint to a motion for leave to file an amended complaint, and it noted in *Schmidt* that failure to attach a copy of a proposed amended complaint is a reason to deny a motion for leave to amend.") (alteration in original) (citing *Schmidt v. United States*, 749 F.3d 1064, 1069 (D.C. Cir. 2014))).  Plaintiff, however, may seek to amend her complaint through a properly supported motion within 30 days of this opinion.  *See, e.g.*, *Creecy v. District of Columbia*, No. 10-cv-841, 2011 WL 1195780, at *11 (D.D.C. Mar. 31, 2011) ("[T]he Court shall deny [the plaintiff's] motion to amend without prejudice; [the plaintiff] may file a new motion for leave to amend that complies with Local Rule 7(i).").  Accordingly, the Court denies Plaintiff's request to file a second amended complaint.

## V.  CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss is granted in part and denied in part and Plaintiff's motion to consolidate cases is denied.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  March 28, 2025                                RUDOLPH CONTRERAS
                                                                         United States District Judge